UNITED STATES (STETTINIUS v.). See Case No. 13,387.

---

## Case No. 16,391.
### UNITED STATES v. STEVENS.
[4 Cranch, C. C. 341.] [1]
Circuit Court, District of Columbia. Nov. Term, 1833.

KEEPING DISORDERLY HOUSE—EVIDENCE OF REPUTATION.

[Cited in Henson v. State, 62 Md. 235; State v. Towler, 13 R. I. 66.]

---

## Case No. 16,392.
### UNITED STATES v. STEVENS et al.
[2 Hask. 164.] [2]
Circuit Court, D. Maine. Nov., 1877.

CRIMINAL LAW—REASONABLE DOUBT—CREDIBILITY OF WITNESSES—CONSPIRACY—EVIDENCE OF ACCOMPLICES — MASTER AND SERVANT — QUITTING EMPLOYMENT.

1. A reasonable doubt is more than a captious doubt. It is a doubt for which a reason may

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

be assigned, not necessarily sufficient to convince another, but such as may properly influence a juror honestly endeavoring to perform his duty.

2. Jurors should not disbelieve a witness, unless for good reason and they must determine the facts regardless of statements either of counsel or court.

3. A conspiracy to obstruct the mail in violation of Rev. St. § 3995, is a violation of section 5440, as a conspiracy to commit an offense against the United States.

4. An intention to obstruct the mail flows from an unlawful act that so operates, although its primary object was to accomplish another purpose.

5. Upon prima facie proof of a conspiracy the acts and declarations of each conspirator are competent evidence to go to the jury upon the trial of any one of them.

6. The jury must be first satisfied of a common design, confederation and purpose, before the acts and declarations of one participating are competent evidence against a confederate to prove the scope and purpose of the conspiracy.

7. It is lawful for employés, without any illegal purpose, to quietly and peaceably leave the service of their employer by concerted action at a given time so long as they do not violate any contract to remain longer.

8. It is unlawful for employés, whose employment is at an end, to combine to induce others to quit the same service at the same time, but before their employment has expired.

9. One, employed to work a day, cannot lawfully quit work before the day is done.

10. An engine driver employed by the day, to daily make a particular run, cannot lawfully quit before the run is made.

Indictment for conspiring to obstruct the United States mail. The defendants [George W. Stevens, George W. Kent, Warren H. Walker, Charles Stevens, Taylor L. Dodge, and Henry G. Mills] were members of the Brotherhood of Locomotive Engineers, and with their fellows, engine drivers on the Boston & Maine Railroad, sixty-seven in all, struck, and by concert of action, quit work at four o'clock in the afternoon. One of these engineers, not a defendant, at work by the day, whose accustomed run was from Exeter, N. H., to Portland, Me., and back, having partly completed his return run in charge of an engine hauling a mail train, at four o'clock stopped the train away from a station in an out of the way place east of Kennebunk in Maine, detached his engine and kept control of it until six o'clock by running it back and forth on the road, then extinguished the fire, drew the water from the boiler and abandoned it, the mails being thereby delayed. The first four defendants were members of a committee of the striking engineers directing or advising their conduct, and all the defendants were convicted.

The cause was heard upon a motion for a new trial for misdirection, and because the verdict was against law and evidence. After elaborate argument, it was considered by the court that no error existed in the charge presented below, and that the verdict was neither against law nor evidence, and judgment

was ordered on the verdict without any formulated opinion.

Nathan Webb, U. S. Dist. Atty.

Almon A. Strout, for G. W. and C. Stevens, Kent and Walker.

Charles P. Mattocks, for Dodge and Mills.

Before SHEPLEY, Circuit Judge, and FOX, District Judge.

FOX, District Judge (charging jury). The counsel on both sides of this cause have dwelt with some force upon its great importance, and I feel that it is not inappropriate for me to reaffirm that proposition. I apprehend that however many causes you may any of you have been engaged in as jurors, there never has been one in which there was really a greater interest and greater questions involved than in the present cause. I know that during the experience that I have had in this place, I have had none come before me in which I felt there were more important matters involved than I feel that there are in the present cause which is now to be determined by you. It is of vital importance to these defendants, because it involves punishment both of fine and imprisonment in case they are found guilty. Therefore, gentlemen, in their behalf I invoke of you a most careful and candid consideration of the testimony, that no wrong be done to them by you in your deliberations. It is also of the greatest importance to the government and to the public at large.

You are well aware that the constitution of the United States has delegated to the United States government the control and direction of the mails. When the government was formed, it was deemed of so great importance, the management of this great department, that it was decided that it should not be committed to the various states, but that the general government for the general public welfare should control and regulate the management of the mails. And probably each one of you, on reflection, will come to the conclusion that there is no department of the government in which the public at large have so great an interest and derive so much benefit from as they do from the post office. Think one moment what the consequences would be if the mails should be destroyed for a single day that are passing merely in this state of Maine—how many sufferers there would be.

The government of the United States, therefore, having had committed to it by the constitution the control of the mails, has seen fit to legislate upon the subject, and has done so fully for its protection. It has declared that it shall be an offense to knowingly and wilfully obstruct the mails. It has also declared that there shall be such an offense as amounts to conspiracy, by the combination of two or more persons to violate the law of the United States, and, having thus combin-ed, by doing some act in perfecting the violation. It has been stated to you what the punishment is in the one case, and what the punishment is in the other, and it is a fact that the law provides a more severe punishment, decidedly more severe, for a conspiracy to violate this provision of the law by knowingly and wilfully obstructing the mails than it does for the mere simple act of one person committing the crime.

You may ask yourselves why the government has seen fit, why congress has seen proper to impose a heavier punishment for the conspiracy than for the crime itself; probably a moment's reflection will satisfy you that it is quite right that there should be this distinction. The crime can be committed by a single person; generally speaking conspiracies are much more substantial than that. The moment there is this combination of purpose to violate the law, there is that element of force brought to bear upon the law which is much more difficult to contend with than the act of a single individual. Here is this combination of men in one case, while in the other there is the single individual. You can all, in a moment, see that where large masses of people are concerned in resisting the law, the law itself has much more to contend with than it would if each one of them stood alone without any combination; that it is much more difficult to resist a mob and escape danger that the law may be put down and the courts be overcome, than in the case of the single individual, where there is not this concert of action. Therefore, it seems to me, it was wise that congress should declare that, while we punish the one man merely for the commission of the offense, if a body of men get together and say we will stand against the law and we will resist and break the law, we will punish these men because they come with more force to resist the law and with power to overcome the court; that it is right and just and proper that there should be this difference made in punishment.

Now, therefore, gentlemen, if these men have violated the law, let them take the consequences of it; if they have not violated the law, it is your duty and no doubt it will be your pleasure to say that they are not guilty. You will remember, that the presumption of innocence is a presumption which the law makes in all cases, even when a party has been indicted by the grand jury of the country. The indictment is simply to put the party upon trial, to subject him to inquiry. You are not, from the mere fact of the indictment having been found, to find that he is guilty of the offense with which he is charged. This presumption remains till you are satisfied of his guilt, and you must be satisfied of his guilt beyond a reasonable doubt. What is meant by a reasonable doubt? I refer you to the language of the Chief Justice of the United States in one of the Ku Klux Cases, where he was called upon to

explain the meaning of reasonable doubt. He says:

"The burden of proof, gentlemen, is upon the government. It is a wise maxim of the law in favor of life and liberty, that every man is presumed to be innocent until he is proven guilty, and this presumption is to continue with you, sitting as jurors, until it has been overcome by the testimony beyond a reasonable doubt. But a reasonable doubt is something more than a captious doubt, a mere vague notion that possibly the accused may be innocent. It must be a doubt for which a reason may be assigned. It need not be a reason sufficient to convince another, but it must be such as may properly influence the mind of one who is honestly endeavoring to perform his solemn duty as a juror." U. S. v. Butler [Case No. 14,700].

That is the language of the chief justice of the United States of America, which I am bound to receive as law, and so declare to you. You are bound, both in civil and criminal cases, to receive as the law whatever the court may declare it to you to be. There must be some tribunal which shall determine what the law is; the law must be fixed and stable and permanent and not dependent on the notions of men who are called occasionally to examine it; and therefore, it has been wisely determined that the court shall declare the law and that the jury shall determine the facts. It is therefore your province to determine all the facts, to believe such witnesses as you see fit; you have no right to disbelieve a witness upon mere prejudiced assumptions without there is something in the appearance of the witness or in his testimony in conflict with other testimony. You should deal fairly and justly with witnesses. and, unless there is some good reason for you to disbelieve them, you should believe their testimony. But the whole is for you; you are to draw your own inferences and pass upon the whole case and determine what is proved to your own satisfaction; you will not be governed in regard to that matter either by the statements of court or counsel. The counsel in the ardor of conflict may miss-recollect or misstate testimony; the court may misapprehend the testimony. So that, after all, if from any source whatever there is a statement made in regard to testimony, which according to your recollection is incorrect, you must be governed by your own recollection and not by such statement, no matter whence it came.

The act of congress (Rev. St. § 3995) declares that "any person who shall knowingly and wilfully obstruct or retard the passage of the mail, or any horse, carriage, driver or carrier, carrying the same, shall, for every such offense, be punishable by a fine of not more than one hundred dollars."

Now, the meaning of this section has been declared by the supreme court of the United States, which in this case I am bound to re-ceive as the law of the land and so declare it to you. The supreme court of the United States in 1868, being called upon to interpret that section, declared: "The statute of congress by its terms applies only to persons who 'knowingly and wilfully' obstruct or retard the passage of the mail, or of its carrier; that is, to those who know that the acts performed will have that effect, and perform them with the intention that such shall be their operation. When the acts which create the obstruction are in themselves unlawful, the intention to obstruct will be imputed to their author, although the attainment of other ends may have been his primary object. That statute has no reference to acts lawful in themselves, from the execution of which a temporary delay to the mails unavoidably follows." U. S. v. Kirby, 7 Wall. [74 U. S.] 485.

That portion to which I especially call your attention as applicable to the charge here as to what constitutes an unlawful and wilful obstruction of the mail is: "When the acts which create the obstruction are in themselves unlawful, the intention to obstruct will be imputed to their author, although the attainment of other ends may have been his primary object." That construction has been carried out repeatedly of late years.

Now that being the crime which these parties are charged with having conspired to commit, and such being the definition of it, what do we find in regard to a conspiracy? There is no general statute touching the subject except section 5440, and that reads as follows:

"If two or more persons conspire, either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not less than one thousand dollars and not more than ten thousand dollars, and to imprisonment not more than two years." That is to say, there must be a combination, an agreement; that agreement may be inferred from the proceedings of the parties; but there must be an understanding with two or more persons to commit an offense against the United States.

Some questions were raised in the outset in regard to this indictment, and whether the allegations which are here found in the indictment constitute an offense. For the purposes of this trial I instruct you, that a conspiracy to commit an offense described in section 3995 is within section 5440, and is an offense under the latter section; that the indictment in the present case is in due form, and with the requisite averments charges these defendants with the commission of an offense under section 5440. If I am wrong in this, and it should be necessary, those who are over me will come in and aid us in the investigation. It seems to me there can be no doubt in regard to it. You will take that

as the law, that this indictment does charge these men with the commission of an offense within these two sections.

Now, gentlemen, in regard to the evidence which has been offered here; some tribunal must determine as to the admissibility of testimony; and the law has declared that the court shall, in the first place, say whether the testimony is or is not admissible as tending to prove the guilt or innocence of the party. The duty, therefore, devolved upon me, sitting here alone, to determine what testimony should be admitted in this cause. The trial has been somewhat more complex than most causes, involving matters which do not often arise, and the court had to thread its way, the best it could, when there was an attempt to offer evidence bearing upon the defendants in the cause, that another party, whom the law may deem the agent of the defendants, had been concerned in performing an act which would be evidence against them.

A good deal of time you will notice was occupied, and properly, in the discussion of the admissibility of testimony; and you must have noticed that the court, whether correctly or not, ruled out a very large portion of the testimony which the government undertook to offer in this cause, and that I have limited the testimony to the acts of the defendants themselves and of those who may be called the "striking engineers." I had doubts whether I was not restricting the government within somewhat narrow limits; I have more doubts now, but, under the circumstances of the case, I gave, in every instance, the defendants the benefit of the doubt. I rejected all testimony to the admissibility of which I entertained any serious doubts, for I did not want to subject them to the consequences of any illegal testimony, because if I did, I should have done them a very great wrong. I, therefore gentlemen, as I think, have admitted not a particle of testimony here which was not clearly admissible against these defendants.

The law is peculiar in regard to conspiracies, and in regard to the evidence of parties who may be said to be co-conspirators. Mr. Greenleaf, the learned author of a book on Evidence, which we all receive in almost every instance as the most correct exposition of the law, says: "A foundation must first be laid by proof, sufficient in the opinion of the judge to establish prima facie the fact of conspiracy between the parties, or proper to be laid before the jury as tending to establish such fact. The connection of the individuals in the unlawful enterprise being thus shown, every act and declaration of each member of the confederacy, in pursuance of the original concerted plan and with reference to the common object, is, in contemplation of law, the act and declaration of them all, and is therefore original evidence against each of them. It makes no difference at what time any one entered into the conspiracy.

Every one, who does enter into a common purpose or design, is" generally deemed "in law a party to every act which had before been done by the others, and a party to every act which may afterwards be done by any of the others in furtherance of such common design. Sometimes, for the sake of convenience, the acts or declarations of one are admitted in evidence before sufficient proof is given of the conspiracy, the prosecutor undertaking to furnish such proof in a subsequent stage of the case. But this rests in the discretion of the judge, and is not permitted, except under particular and urgent circumstances, lest the jury should be misled to infer the fact itself of the conspiracy from the declarations of strangers." 1 Greenl. Ev. § 111.

And in another volume he again calls our attention to this same subject, and declares: "The evidence in proof of a conspiracy will generally, from the nature of the case, be circumstantial. Though the common design is the essence of the charge, it is not necessary to prove that the defendants came together and actually agreed in terms to have that design, and to pursue it by common means. If it be proved that the defendants pursued by their acts the same object, often by the same means, one performing one part and another another part of the same so as to complete it, with a view to the attainment of that same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object. Nor is it necessary to prove that the conspiracy originated with the defendants, or that they met during the process of its concoction; for every person entering into a conspiracy or common design already formed is deemed in law a party to all acts done by any of the other parties, before or afterwards, in furtherance of the common design. The principle, on which the acts and declarations of other conspirators and acts done at different times are admitted in evidence against the persons prosecuted, is that, by the act of conspiring together, the conspirators have jointly assumed to themselves, as a body, the attribute of individuality so far as regards the prosecution of the common design, thus rendering whatever is done or said by any one in furtherance of that design a part of the res gestæ, and therefore the act of all. It is the same principle of identity with each other that governs in regard to the acts and admissions of agents when offered in evidence against their principals, and of partners as against the partnership." 3 Greenl. Ev. §§ 93, 94.

In this same Ku Klux Case, the chief justice of the United States had occasion to consider this branch of the law, and he there declared more concisely, but substantially as Mr. Greenleaf has declared: "Each member of a conspiracy is responsible personally for the acts of every member thereof, done in furtherance of its illegal purpose, whether

he be himself present or not. It follows that the acts and declarations of one of the conspirators, while actually engaged in giving effect to the common purpose, may be given in evidence against his co-conspirators. Having a common purpose, the acts and declarations of one, while carrying that purpose into effect, are the acts and declarations of all. But isolated acts of violence by individuals who may have been engaged in the conspiracy cannot be used against the others, unless it appears that they were done in furtherance of the common purpose. All are bound by them if they resulted from the original unlawful agreement between the parties to accomplish by their concerted action the proposed result."

You thus have the law clearly declared by the chief justice of the United States of America, that parties may be affected by the acts of others when there is a conspiracy to commit a common crime, when they are all actuated by a common purpose to effect a common result. The acts of one affect the others exactly as the acts of your agent would affect you, Mr. Foreman, in case you employed an agent to transact any business for you.

But, gentlemen, although in the outset the admission of this testimony was a matter for the opinion of the court, exercising its best judgment, after all, it comes back to you for your consideration under the following instruction: I say to you that in the opinion of the court there was prima facie evidence that these defendants with the other engineers, who on February 12th quit the employment of the Boston & Maine Railroad, were jointly acting in combination and concert, and aiding and assisting each other in carrying out the common purpose of a violation of section 3995, in obstructing the mails, so as to make the acts and declarations of such engineers done and made in the furtherance of, and during the pendency of the unlawful purpose, competent evidence to go to the jury against these defendants, but that it still remains a matter for the determination of the jury, whether those engineers were so acting in concert and co-operating with each other and these defendants in the common design of wilfully obstructing the mails. If so acting in concert and co-operating, in the opinion of the jury, then their acts and declarations, if done and made in pursuance of, and while engaged in carrying out the common design and object, and before it had been completed and determined, were competent evidence to be weighed by the jury against these defendants; but if not so co-operating, then such acts and declarations are not to be considered by the jury, but are to be rejected from the case, in pursuance of the general principle, that the acts and declarations of one person are not evidence against another.

So that it comes back to you to consider whether there was this concert and combination among all these persons—among the whole sixty-seven engineers. If so, then whatever any one of them thus did or said in furtherance of the common object is competent evidence to weigh against the rest. But, if there was no combination, the defendants are not to be affected by the acts of a stranger for whose acts they are in no way responsible.

We now come to the charge which is made and the evidence introduced by the government to sustain that charge. There are upon trial six men; two by the name of Stevens, one by the name of Kent, and one by the name of Walker, have been known throughout this trial as a committee of somebody or some party; there are two others upon trial, who were not members of the committee, Mills and Dodge; there are two other persons named in the indictment, Whitten, about whom you have heard a good deal, but who is not now upon trial, and Merrill, whom we have heard but little of, and who, I understand, was not originally one of the men who struck, but was one of the new men engaged, but whom it was claimed did not perform his contract. Your attention is to be directed to the four men of the committee and two other men, Dodge and Mills.

The government charges that the defendants conspired together to wilfully and knowingly obstruct the mails running on the Boston & Maine Railroad from Portland to Boston. The charge is that this was done on the twelfth of February. I have to say to you that the government is not confined to that day; it may prove the act at any time and on more than one day at or about that time; and if it does prove the offense to have thus been committed by these defendants, it is sufficient, although the averment is that it was on the twelfth of February.

The government has offered before you certain documentary testimony, which I do not understand is denied to be connected, so far as it is of any avail, with these first four defendants, the two Stevens', Kent and Walker. There are these papers which purport to be signed by them. Whether they were signed by them or not, you will probably think is of very little consequence, because there is no question made but that these papers are their acts, as I understand. You will have these papers before you, and in connection with them the letter of Arthur, who was the head man of the Brotherhood of Locomotive Engineers. Examine them carefully, and see what they say and what they propose to do. In the first place you will ask yourselves the question, for whom did these men act? Were they acting for themselves, or were they acting for the whole Brotherhood of Engineers? And, if you take these communications together, all which eventually came to Mr. White, president of the Boston & Maine, you will

judge for yourselves whether there can be any doubt that these men did not merely act for themselves, but that they claimed to act in behalf of, and as representing the whole body of the engineers of the Boston & Maine. It is important that you should take this matter into consideration in an ulterior view of the case. If they were acting for all the engineers, then you will enquire whether they had authority to act for all the engineers. It is for you to determine, from all the testimony, whether or not these men assumed to act merely for themselves as a committee, without being delegated by the engineers as a body, or whether the whole body of engineers got together and appointed these men their committee to carry out their purposes. I think, gentlemen, but of that you will judge, that the evidence shows that this committee did not undertake to act for themselves alone, but undertook to represent the whole body of engineers.

What do they say they will do? In those letters they make various demands, claiming to act, and saying they are acting in behalf of the engineers of the railroad; they finally come to the conclusion that on the twelfth day of February, at four o'clock, they will quit work if their demands are not complied with. The defendants say that is all they undertook to do, that is the whole extent of all these men had any purpose or design to accomplish; merely to quit work. I have a few words to say to you in regard to the rights of men to quit their work under such circumstances. We all understand that in this country no man can be made to make any particular contract with another person or company as to his work. Each man is at liberty to make just such a contract as he pleases. On the other side, the corporation is at liberty to employ him, and has a right to say just what the terms of their contract shall be, what shall be the extent of the labor, and how long it shall continue, and when it shall determine; and no man can step in between them and say, "You have no legal right to do anything of this kind."

So that, gentlemen, each one of these engineers had a right to make his own bargain with this company to be employed at just such wages as the company would agree to give him, and if he did not choose to employ with them, he could go on his way and leave the company to procure other men as it could. They had a right to elect that the term of service should be a week, or two weeks, or a year, or a day; whatever the term of service was, the parties were obliged to carry out, or else they would be guilty of violating their contract.

Now, I say to you this: Where there was no term of service agreed upon, or if the term of service which was agreed upon had expired, then the man had a right to leave the service, and nobody had a right to compel him to remain in the service. In this case I go farther than that, and say that these engineers had a right, if they saw fit, peaceably and quietly and without having any illegal purpose or object in view, to agree among themselves to quit work at any hour after reasonable notice, at an hour when they were not under a contract to work beyond that hour; but, if they were under contract to work beyond that hour, then for any combination or concert of men whose time was up, and so declared, to induce the others, whose time was not up, to violate their contract, to break off and leave their work, was an illegal act which the law would not justify them in doing.

Now, gentlemen, it may be important for you to determine, when you come to what was done on the twelfth of February by these different engineers, whether there was any concert of action to cause persons, who were under obligation to work beyond four o'clock of that day, to violate that contract to quit their work when they were bound by their contract to continue their work. That is a matter for you to determine. The evidence, as I understand it, is, but as I have before said, when I state testimony, it is always subject to your recollection, that there was no obligation for any man to work for any length of time beyond the day on which he was employed; they were hired by the day and were paid by the day, and when the day's work was ended, under that contract, they were at liberty to quit. But, gentlemen, if a man was employed to do a day's work, if that was the contract under which he was employed, he had no right to quit at four o'clock and say, I will not work beyond this time, for he would thereby violate his contract just as much as though he had been hired by the year, and had quit after working but six months, and said the balance he would not work. The duration of the contract is of no consequence, provided there was a conspiracy to induce the men to break their contract, to give up their work during the time the contract was in force, which it required them to go on and complete.

This point is important as bearing upon the conduct of Whitten and of Cook, who, I think, were on the noon trains between Boston and Portland. I inquired particularly of Mr. Furber, but you will recollect what the obligation was, what those men were expected to do under their contract with him, for how long they were hired and what was the route which they were engaged for, and he went on and stated that they were hired by the day, that the route which they were employed for was between Exeter and Portland, back and forth. Now, gentlemen, if that was the contract, and those two men were employed on the twelfth of February to run from Exeter to Portland and back again, they had no business, when they were in the course of performing that contract, to quit their

engine, and the other men had no business to induce them to do it; and if there was a conspiracy, therefore, on the part of those men whose time was up, and who were under no obligation to work during the rest of the day, if those men conspired to induce and did induce these two men to quit their work for one hour during that day, when by the terms of the contract they were obliged to work the day out, it was an illegal arrangement, an illegal act which the law will not justify.

It is for you to determine from all the testimony what this contract was, how Cook and Whitten were employed, and whether their contract was of that character that they had a right to quit any moment and leave their train where it might be, in the woods, and take the engine and go off and leave the passengers there; or whether the contract was that they should take that train through to Portland or to Exeter, deliver it up there, and thus do the work they agreed to do. If the contract was, as last stated they were guilty of a breach of contract in not doing it. It is for you to determine whether there was in this respect a conspiracy to do an illegal act.

I repeat, that no man who was under any obligation to work after four o'clock had a right to agree with his fellows that he wouldn't work after that time. If they were under no obligation to work after four o'clock, they had a right to enter into an agreement to leave at that time, but they had no right to undertake to induce parties, who were obliged by contract to work beyond four o'clock, to break that contract and leave their work. Therefore, you will determine this question in the first place, what the contract of these men was, the one who left the Portland train going out and the one who left the Boston train coming down, and the other man on the Newburyport train, and whether or not they were justified, under the terms of the contracts they had entered into, in leaving the trains as they did. There may be no positive direct testimony before you as to what these contracts were. Perhaps there is no direct testimony before you that Whitten agreed to run his train from Portland to Exeter and from Exeter to Portland. It is for you to say what was a fair understanding of that contract and whether these men had a right to leave their engines and thus abandon the road, abandon the train and abandon the mail for two hours at least as was done by Whitten. Therefore you will examine that question for yourselves, determine what these contracts were, whether there was any breach of them, and whether these defendants conspired with them to break their contracts.

Now, gentlemen, what was done on the twelfth of February? I propose to read some of the testimony upon this point to you, not trusting to my own recollection in regard to it; I do not even ask you to trust to my minutes, but, refreshing your recollection, you will determine whether I am correct or not. We will, in the first place, take the afternoon train which left Portland, and I will call your attention to Weymouth's testimony. He says:

"I was conductor of passenger train on Boston & Maine mail train February 12th; I was to leave Portland at three o'clock for Boston, started on time. Benjamin Whitten had charge of engine, Murray fireman, six cars all told. We got within about three miles of Kennebunk depot, train was stopped, unusual place. I looked out and found engine had left the train and was some distance off, moving. I left the train in charge of baggage master and brakeman; called on Howard and a fireman with Smith to go up the track with me. Howard was a spare engineer in the car. We went up the road; locomotive stopped near a mile from train. When we were within a short distance, engine started again, went half a mile and stopped. We got within a short distance; engine moved and then stopped; it pretty soon came back twenty miles an hour, passed us. Whitten was on, managing the engine; I signalled to him; he made signs he would receive me; he stopped a short distance below us, he said 'keep them men back and you may come up.' Some passengers were following us. I stopped the men, went to the engine; old fireman was on; I got on engine, on foot board. Whitten said he was willing for me to get on, but 'them men' should not on any condition, nor no one else with the intention of taking the engine from him. I asked Whitten, if he struck at four, by whose authority he was keeping the engine. He said he was ordered by the committee to keep the engine till six unless a compromise was made with company, in which case, they would be notified by telegraph; if they received notice to keep on working, he would back up and couple on train by my notifying him from the office, and that if he did not get any order from Boston, at six he should leave engine without any water in tank or boiler, or a fire, with pump let down so sne should not be hurt if she stood there all night. I told him I would go to the depot and if any order came I would notify him. He said orders were to come from committee; I was not able to regain engine before six."

There you have the statement of what was done by Whitten with that engine, and that testimony is corroborated to some extent by Howard. You have also the testimony in regard to the other engine which was the other side of Kennebunk. That engine, if I recollect right, had Cook on as engineer, and when they got down in the vicinity of Wells, according to the testimony, he signalled and the brakes were put on. He disconnected his en-

gine and kept possession of it until about six o'clock when it was given up without any damage being done to it of any kind, excepting the fire was out, the hose was disconnected and the water was out of the boiler. You have also the testimony in regard to the train on the Newburyport branch.

Here are three engines connected with mail trains. You will ask yourselves in the first place, were those mails obstructed on that day? Were they wilfully and knowingly obstructed? That is to say, did those who had charge of the engines purposely and designedly separate the engines from the cars and prevent the trains from going on and prevent the mails from being carried? Because if the train could not go on, the mails which are a part of it could not, and a detention of the train would be a detention of the mails. You will ask yourselves whether there is or not any question that on that day, the two mails between Boston and Portland, one up and the other down, were obstructed and were obstructed for some little time? And that, I understand the testimony shows, was done by Whitten and Cook. Were Whitten and Cook, in what they did, carrying out the common design with these defendants of obstructing and detaining the mails? And was their object to obstruct and hinder the train from going forward at that time? If you find that was the common purpose and object, and it necessarily resulted from it that the mail was detained, then you will be justified in finding that they conspired together to wilfully and knowingly obstruct the mail.

Now the defendants say that they had no such purpose as that: "Our object was to quit work; these men have done what they did beyond and outside of what we contemplated; we supposed and knew that the company were advised of what we were about; they had made arrangements to take the trains out of our hands at four o'clock, and we supposed it would be done, the old men stepping out and the new men stepping in." If that was their purpose, simply to quit work themselves, and they conspired simply to quit work, those who had a right to, whose time was up, it was all right. If their time was not up, they were guilty of a breach of contract and were acting illegally.

The government says that the testimony shows very conclusively that the object was far deeper and beyond any thing of that kind; that there was a purpose, a design to obstruct and retard the trains, to interrupt all the business of the road, and that that purpose, at four o'clock, in the vicinity of Boston, was carried out; that the cars were disconnected from the engines, and that they retained possession of the engines for two hours after four o'clock, hoping that some arrangement might be made.

If these men agreed together to interrupt all the business of the road, to detain all the trains wherever they might be, if that was their object, and if it necessarily followed from a detention of the trains that the mails were obstructed, and they did this knowingly and wilfully, you will be justified in finding these defendants guilty of conspiring to knowingly and wilfully obstruct the mails.

These men say they were acting as "committee of all the engineers." What are the acts of three of their principals, three of the men, for whom these four men say they were a committee, whom they undertook to represent? What do we find their principals doing? We find them separating their locomotives from the trains, running away from them in the way that has been stated before you, and not on four o'clock quitting work and leaving the engines as they then were, for men, it is argued, were known by the defendants to be ready to take their places when it was necessary. The government goes farther and says that there are other facts in connection with this which show it was not their mere purpose to quit work then, but that it was to interrupt the business of the road, and especially to delay all its trains; and those facts are that there were a number of locomotives in the yard in Boston, and when Furber and Smith called for those locomotives and let the engineers know that they would take them into their possession, and then went to get men to take their places, returning in less than five minutes, they found the fires dumped, the hose disconnected and water out of the boilers. If it was their purpose simply to leave work, the government asks you why did those men, when they could have quit their engines in a moment, instead of doing that, do what they could to render them for the time being unfit for use?

It was said long ago, "By their fruits ye shall know them." And by the acts of these men you must judge what their purpose and design was. If it was simply to leave their work, would they not have done it without detaining these trains, or dumping the fires, or drawing off the water, or disconnecting the hose? Would they not at once have given up the trains to the various men who were there to take them? Was their purpose to retain the possession of the train, which was delayed, when coming to Portland, two hours, in order that some arrangement should be made? Or was it simply that they did this of their own will and pleasure without in any way acting in concert with those in Boston.

Then, there is another fact which it is my duty to call your attention to, and that is the condition of trains up and down the road. You have the testimony of Beal, that after four o'clock, according to his recollection, there was not a single live engine on that road. Hamilton, who was on the road with him, thinks there was one which was running from Lawrence into Boston. Beal says that, all the way up and down that road, the engines were set one side with fires out, water drawn off, and were left in that condition.

The government asks you whether or not these are the acts of men who merely meant

to quit work, or the acts of men who meant to put this road in such a position that its trains for the time being should be interrupted. The matter is for you to decide, and not for me, drawing your own inferences, applying your reason to it, judging these men by their acts and the consequences of their acts, whether they did intend that which the government says they did.

Now, stepping beyond the twelfth of February, what do you find? You find that there was a train which should have left Portland the next morning, but which did not leave till about noon. You find that one engineer was bought off, and that, when they undertook to put another engineer on, stories were circulated in regard to the engine being unsafe, and that he did not go, and when a third was procured, the old man, the witness Bonney tells you what took place in regard to him. You have testimony that Whitcomb, one of the striking engineers, came to the Preble House with two or three men, merely bowed to Beal, and then left the two or three men who accompanied him there in conversation with Beal; that these men there drew out the sum of $1500 and actually offered it to him on condition that he would abandon his train and not run it to Boston the next day, and that Whitcomb, afterwards, in conversation inquired whether they had made a trade with him or not, and blamed him for not being willing to carry out the arrangement. That evidence is for you to consider as bearing upon the question as to what these parties contemplated. What did the striking engineers, as a body, contemplate? Did they contemplate leaving their employment and going about their own business? Or did they contemplate so dealing with the road and the new men employed as to compel the road to take old men back into their employ and forgive what had taken place.

There is also the testimony of Averill, the new engineer, who run down here to Portland. He says that Mills met him the next morning, and that an arrangement was made by which they were to pay him the sum of $100, $20 down, and then to employ him for a certain length of time. You will recollect the conversation which took place. He states that: "Mills told me he would write a letter to Arthur to show the agreement I had made. I told him to write to Geo. W. Stevens and he would show it to Arthur. He said he would do it." Mills does not appear to have written that letter, but somebody wrote a letter and handed it to Averill and he says "I took it up and showed it to Stevens. Presented the letter to Stevens at room forty-seven, the headquarters of the Brotherhood. Stevens opened the letter and said it was all right; he spoke of Arthur's seeing the letter. Arthur saw it, said it was all right and they would do as they agreed. I was in their office every few days. I had some conversation with three of these men, Chas. Stevens, Kent and Walker, at the Brotherhood in regard to their paying me. I had conversation with Mills and Whitcomb. They said that they were sure of carrying the day, going to beat the B. & M. in a few days. They said a good many men had been bought off and that they had money enough."

It is for you to say whether or not Averill's testimony should be believed. One of the learned counsel says he does not believe his story. The reason why he would not believe him is not before you. It may be that his being counsel in the case may make some difference in that respect. The question is whether you believe him, whether you have any right to disbelieve what he has said. If there is anything inconsistent in his story, if his appearance is that of an untruthful witness, you should make such deductions as you think proper. What is his testimony? He testifies expressly that four of these men, Geo. W. Stevens, Chas. Stevens, Kent and Walker all spoke about paying him and carrying out a contract which he had made with Mills in regard to his employment if he would leave the road. Is that or not evidence bearing upon this question. And is it or not important, as bearing upon this question, whether there was an agreement with these four men simply to quit work, or whether they still continued on that day carrying out the purpose and object of preventing the running of the road, of obstructing the trains, of hindering everybody, whether connected with the mails, or the running of the road, or passengers from passing over that road? Does it or not show that after this twelfth of February they were doing all they could to hinder and obstruct the business of that road? If that was so, and they were endeavoring to carry out that purpose and design, you may well find that they were guilty of conspiracy to knowingly and wilfully obstruct the mails.

You have the testimony of Hilton and the paper produced by him dated February twentieth, by which it was agreed that Hilton should receive three dollars and a half per day during the strike, and sixty dollars per month for three months after, and that he should be admitted to the Brotherhood. That is signed by Arthur, Sanborn, Webster, and also by Chas. Stevens and G. W. Stevens, who are two of the defendants and who were two of the committee. The government claims that this testimony corroborates that of Averill, and shows that these men meant something more than to quit work; that they meant to impede and obstruct the operation of that road; that they were doing what they could to prevent Hilton from further running on that road.

Gentlemen, you are obliged, having taken the oath you have, to decide this cause according to the evidence; to look the matter fairly and squarely in the face, and let your honest judgments, your conscientious

convictions decide this matter. Let your common sense determine what these parties meant by all they did and said, and how far their purpose was to obstruct and hinder the business of that road. If you find that there was a common purpose and object to hinder the road and prevent its running, hoping thereby to be reinstated, and that it was a necessary consequence of such hindrance that the mails were retarded, and that they wilfully and knowingly hindered and retarded the mails, it is your duty to find these men guilty so far as they are connected with it. What I have said has been mostly in regard to the four committee men. You have the testimony in regard to Mills. You will judge whether if the others are guilty there is any doubt as to his guilt.

Then comes the testimony in regard to Dodge. The government says he ran his engine on to the wharf in Portland, but so long as there was anything for him to do, he staid by and did his duty faithfully; but they say he was one of the conspirators originally, and that before six o'clock he had made up his mind to quit work, and had left his engine down there where he had no right to. If you find the others guilty, and you think you are justified in making any exception in his case, you will acquit him, if not, convict him. You are at liberty to convict one or more, or all, or acquit all.

Now take this case and apply your honest judgment to it, and render such a verdict as the law and the evidence warrant. If in any way you allow yourselves to be governed by fear or prejudice, there will be no satisfaction, after you have returned to your homes, in the retrospect of your labors here.

Several requested instructions have been passed to me.

1. "The means of carrying out the alleged conspiracy when made unlawful by statute, should be fully set out, and must be proved as alleged." I have given you that instruction and repeat it.

2. "An association of workmen formed for the purpose of raising their wages is not unlawful." If that is the mere object, to raise their pay, and they do not undertake to do anything illegal, it is not unlawful.

3. "The presumption that a man shall presume the natural and necessary consequences of his voluntary acts does not apply in a criminal case where the act done or contemplated (in case of a conspiracy) was lawful and the means lawful." If they undertook to do a lawful act, there is no presumption that they intended to do any unlawful act.

4. "Where a criminal charge is to be proved by circumstantial evidence, the proof ought to be not only consistent with the prisoners' guilt, but inconsistent with any other rational conclusion." So far as the proof depends upon circumstantial evidence, that is a rule of law which you are bound to apply.

5. "In this case, it is a fact to be left to the jury to determine, whether the acts done or contemplated were wilfully and knowingly done." I give that.

6. "Conspiracy is a corrupt agreeing together of two or more persons to do by concerted action something unlawful, either as a means or an end." That, I suppose, is a true definition of conspiracy at common law.

7. "If the jury merely find that several of these defendants conspired to do one illegal act, and that certain others of the defendants conspired to do another illegal act, they cannot bring in a verdict of guilty against any of the defendants." There must have been a concert of action to do the illegal acts charged in the indictment or else you cannot find them guilty.